# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

| | |
|---|---|
| MADELINE BUCKLEY, an Individual, TERRENCE JAMES, an Individual, STACEY WESCOTT, an Individual, COLLEEN KUJAWA, an Individual, DEANESE WILLIAMS, an Individual, DARCEL ROCKETT, an Individual, and CHRISTY GUTOWSKI, an Individual, on behalf of themselves and all others similarly situated <br><br> Plaintiffs, <br><br> v. <br><br> CHICAGO TRIBUNE, LLC, an Illinois corporation, ALDEN GLOBAL CAPITAL, a Delaware corporation, TRIBUNE PUBLISHING COMPANY, a Delaware Corporation, and DOES 1 through 100, Inclusive <br><br> Defendants. | Case No. <br><br> **CLASS AND COLLECTIVE ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF:** <br><br> 1. **VIOLATION OF EQUAL PAY ACT (29 USC § 206(d));** <br><br> 2. **SEX DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 USC § 2000e-2(a));** <br><br> 3. **RACE DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 USC § 2000e-2(a));** <br><br> 4. **SEX DISCRIMINATION IN VIOLATION OF ILLINOIS HUMAN RIGHTS ACT (775 ILCS 5/1-101, *et. seq.*);** <br><br> 5. **RACE DISCRIMINATION IN VIOLATION OF ILLINOIS HUMAN RIGHTS ACT (775 ILCS 5/1-101, *et. seq.*);** <br><br> 6. **RACE-BASED PAY DISPARITY IN VIOLATION OF ILLINOIS EQUAL PAY ACT OF 2003 (820 ILCS 112/1, *et. seq.*)** <br><br> 7. **SEX-BASED PAY DISPARITY IN VIOLATION OF ILLINOIS EQUAL PAY ACT OF 2003 (820 ILCS 112/1, *et. seq.*)** <br><br> **DEMAND FOR JURY TRIAL** |

1

Plaintiffs Madeline Buckley, Terrence James, Stacey Wescott, Colleen Kujawa, Deanese Williams, Darcel Rockett, and Christy Gutowski (collectively "Plaintiffs"), as individuals and on behalf of themselves, all others similarly situated, and the general public, complain and allege on information and belief the following against Defendants Chicago Tribune, LLC ("Tribune"), Alden Global Capital ("Alden"), Tribune Publishing Company ("Tribune Publishing"), and DOES 1 through 100 (collectively "Defendants" or "Chicago Tribune").

## INTRODUCTION

1.     This case is about the Chicago Tribune's company-wide, illegal underpayment of female and African American journalists.  The former owners of the Chicago Tribune, the Tribune Publishing Company, are no strangers to allegations of underpaying their female and minority newsroom workers having previously been sued in a class action involving employees of the Los Angeles Times. Alden, for its part, has earned a reputation for buying newspapers around the country and gutting staff in order to increase profits at the expense of quality journalism. The Washington Post called Alden, "one of the most ruthless of the corporate strip-miners seemingly intent on destroying local journalism."[1]

2.     The Chicago Tribune employs some of the most highly-regarded journalists in the nation, with individualized talents, experiences, and contributions to our national conversation. However, one thing remains consistent across each section of the Chicago Tribune's news operation – women and African American employees are underpaid by several thousands of dollars a year compared to their male and white counterparts. No legitimate factors account for the enormous, statistically significant pay gap that the Tribune has created and intentionally maintains.

---

[1] Sullivan, Margaret (March 15, 2018). "Is this strip-mining or journalism? 'Sobs, gasps, expletives' over latest Denver Post layoffs". The Washington Post. Retrieved June 5, 2019.

3. For example, Plaintiff James, the second-most experienced photojournalist in the Tribune newsroom is paid less than almost every other photojournalist.

4. Plaintiff Williams, with more than sixteen years' experience at the Tribune, is the second lowest paid deputy senior content editor. The only deputy senior content editor who makes less than her is a 2022 college graduate who has been with the paper for 18 months and is paid $2,000 less.

5. Plaintiff Wescott, a photojournalist who was part of a Pulitzer Prize winning team, is paid $10,000 less than a male photojournalist with half her experience.

6. Plaintiffs and members of the proposed federal and state Equal Pay Classes (defined in more detail below) are female employees, and/or African American employees who were/are employed by Defendants at all levels within these "Covered Positions" and among varying titles or levels):

    (1)    Reporter, which covers writing and reporting positions, and includes positions titled as Reporter and Senior Reporter;

    (2)    Editors includes news, features, opinion, photo, sports, and audience work groups, and includes positions titled Deputy Senior Content Editor and Content Editor;

    (3)    Photojournalists include all Photographers.

7. Each state or federal Equal Pay Class is comprised of employees performing equal or substantially similar work on jobs, the performance of which requires equal or substantially similar skill, effort, and responsibility under similar working conditions.

8. Plaintiffs are informed and believe that Defendants' policies and practices described in this Complaint adversely affect women and African American employees in other job positions not limited to the Covered Positions

identified above. The Class Representatives seek to represent all female and/or African American employees of Defendants in non-managerial positions with respect to Plaintiffs' intentional discrimination and disparate impact/disparate effect claims under federal and state law.

9.     Defendants' employees face discrimination in pay based on sex, race, and ethnicity as a result of centralized policies and practices. Defendants fail to maintain transparency when it comes to pay decisions and instead foster and enforce a culture of secrecy surrounding the pay and salaries of their workforce.

10.     Defendants also relied on diversity recruitment programs such as Metpro and Residency programs as a source of cheap labor to depress the salaries of women and minority journalists. The Chicago Tribune utilized the programs to recruit talented, mostly women and minority, journalists into temporary year-long positions.  In the program, the Residents were paid significantly less than their colleagues who performed the same work. If Residents were able to secure a full-time position after their temporary Residency ended, the Chicago Tribune used the Resident salary to anchor the employee's starting salary. The stark gaps that emerge between the salaries of male or white reporters and the depressed salaries of female or African American reporters hired through the Metpro and Residency programs demonstrate that the Metpro and Residency programs are a source of the pay discrimination.

11.     Defendants also intentionally hire women and African American employees from suburban newspapers – including ones they own – that they know pay much lower salaries than major newspapers. White employees, particularly white male employees, on the other hand, are more often recruited from other major news organizations and are offered higher salaries as a means to induce them to accept employment with Defendants. Plaintiffs are also informed and believe that Defendants rely on employees' past salaries to determine pay, which

4

institutionalizes and internalizes discriminatory pay disparities.

12. Plaintiffs are informed and believe that Defendants' pay policies and practices impermissibly rely on sex, race, ethnicity, and past pay inequities.

13. Defendants paid and continue to pay female employees in the Sex-Based Equal Pay Plaintiff Classes (defined below) systematically lower compensation than Defendants paid and continue to pay male employees performing equal or similar work on jobs that require equal or similar skill, effort, and responsibility, under similar working conditions. The difference in pay is not based on (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a bona fide job-related factor other than sex.

14. Defendants paid and continue to pay African American employees in the Race-Based Equal Pay Plaintiff Classes (defined below) systematically lower compensation than Defendants paid and continue to pay non-African American employees performing similar or equal work on jobs that require similar or equal skill, effort, and responsibility, under similar working conditions from five years prior to the filing of this Complaint through the present date. The difference in pay is not based on (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a bona fide job-related factor other than race.

15. Defendants paid and continue to pay female and Black and/or African American employees in non-managerial positions systematically lower compensation than Defendants paid and continue to male and/or not Black or African American employees because of their Sex and/or race and/or ethnicity. Sex, race, and/or ethnicity are motivating and substantial factor(s) in Defendants' decision to pay its female and Black and/or African American employees less than their male and/or non-Black and/or African American peers. Defendants would

not pay the Plaintiff Class less if they were male and/or non-Black and/or African American.

16. Defendants' policies and practices, including: (1) use of diversity outreach programs like MetPro and Residency Programs to recruit talent to whom they then pay significantly depressed rates; (2) hiring and recruiting women and African American employees from Community or Local Suburban Newspapers, where Defendants anchor pay offers to depressed salary rates, while recruiting white and male employees from major papers where Defendants offer competitive market salaries; (3) reliance on prior salary history; and (4) encouraging and maintaining a culture of pay secrecy, have an unlawful, disparate impact on female and Black and/or African American employees without serving a legitimate business need.

17. At all relevant times, Defendants knew or should have known of the unlawful pay disparity between: (a) female and male employees; and (b) between African American employees, on the one hand, and white employees, on the other. Employees raised the issue of unequal pay to past and current ownership on a number of occasions and yet Defendants have failed to equalize employees' pay for equal or substantially similar work or provide back pay for years of discriminatory underpayment of wages. Current ownership will not even acknowledge that an impermissible pay disparity exists despite being presented with statistical and anecdotal information showing this disparity. Defendants' failure to pay female and African American employees the same compensation paid to male and white employees for equal or substantially similar work was and is willful and intentional.

18. Defendants' actions violate the Federal and Illinois Equal Pay Acts, Title VII of the Civil Rights Act of 1964 ("Title VII") and the Illinois Human Rights Act ("IHRA").

19.    Based on the claims described in this lawsuit, Plaintiffs and members of the proposed Classes seek the balance of the difference between the wages, including interest thereon, an equal amount as liquidated damages, all applicable statutory and civil penalties, non-economic damages, punitive damages, and attorneys' fees and costs.  Plaintiffs, on behalf of the Plaintiff Classes (defined below), seek to certify their claims under Rule 23 or as a collective action under the Fair Labor Standards Act ("FLSA").

## JURISDICTION AND VENUE

20.    The Plaintiffs' federal claims arise under the Equal Pay Act of 1963, 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., as amended.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

21.    Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to this case occurred in this district.

## EXHAUSTION

22.    Plaintiffs timely filed cross-filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") and Illinois Department of Human Rights ("IDHR") on May 15, 2024.

## PARTIES

23.    Madeline Buckley is a woman who is employed by the Chicago Tribune as a Senior Reporter and has worked for Defendants since 2017.  Plaintiff Buckley is a resident of Cook County, Illinois.

24.    Plaintiff Terrence James is an African American man employed by the Chicago Tribune as a photojournalist and has worked for Defendants since 1998. Plaintiff James is a resident of Cook County, Illinois.

25. Plaintiff Stacey Wescott is a woman who is employed by the Chicago Tribune as a photojournalist and has worked for Defendants since 1999. Plaintiff Wescott is a resident of Cook County, Illinois.

26. Plaintiff Colleen Kujawa is a woman who is employed by the Chicago Tribune as an Opinion Content Editor and has worked for Defendants since 2012. Plaintiff Kujawa is a resident of Cook County, Illinois.

27. Plaintiff Deanese Williams is an African American woman employed by the Chicago Tribune as a Deputy Senior Content Editor for the emerging news desk and has worked for Defendants since 2007. Plaintiff Williams is a resident of Cook County, Illinois.

28. Darcel Rockett is an African American woman employed by the Chicago Tribune as a Senior Reporter and worked for Defendants from 2008 until 2009 and again from 2010 until the present. Plaintiff Rockett is a resident of Cook County, Illinois.

29. Christy Gutowski is a woman who is employed by the Chicago Tribune as a Senior Reporter and has worked for Defendants since 2010. Plaintiff Gutowski is a resident of DuPage County, Illinois.

30. Defendant Chicago Tribune, LLC is subject to personal jurisdiction as an Illinois limited liability corporation, with its principal place of business in Cook County, conducting substantial and continuous commercial activities in Illinois. The Chicago Tribune, LLC is the entity that appears on the wage statements of Plaintiffs and members of the putative class and holds itself out as the employer of the class. "The Chicago Tribune is the flagship publication of Chicago Tribune Media Group (CTMG) which also publishes six daily suburban publications, including the Daily Southtown, Post-Tribune, Naperville Sun, Lake County News-Sun, The Beacon-News and The Courier-News, as well as more than 30 weekly community publications." https://www.chicagotribune.com/about/

31.     Defendant Alden Global Capital, a Delaware corporation, is subject to personal jurisdiction conducting substantial and continuous commercial activities in Illinois. Alden Global Capital purchased Tribune Publishing in 2021.

32.     Defendant Tribune Publishing Company, a Delaware corporation, is subject to personal jurisdiction conducting substantial and continuous commercial activities in Illinois. Tribune Publishing is a media company that operates local media businesses, including the Chicago Tribune before it was sold to Alden.

33.     At all relevant times, Defendants were and are employers covered under 29 U.S.C. § 203(a, d), 820 ILCS 112/5, 775 ILCS 5/1-101, *et seq*.

34.     Plaintiffs are informed and believe that Defendant Tribune Publishing was a joint employer of Plaintiffs and putative class during the time it owned the Chicago Tribune. Defendant Tribune Publishing had the authority to set bonuses, raises, and compensation for the Chicago Tribune employees. Defendant Tribune Publishing was aware of the unlawful disparities, but failed to develop compensation policies which rely on permissible criteria for wage disparities. Plaintiffs are informed and believe that Defendant Tribune Publishing was aware of the unlawful pay disparities prior to selling the Chicago Tribune to a new owner, had the power to correct these inequities as Defendant Tribune Publishing was ultimately in charge of the centralized group overseeing the Chicago Tribune operations and compensation decisions. Instead, Defendant Tribune Publishing created a discriminatory environment that perpetuated the unlawful pay disparities based on sex, race, and ethnicity that emerged among Defendants' employees.

35.     Plaintiffs are informed and believe that Defendant Alden Global Capital is a joint employer of Plaintiffs and putative class. Defendant Alden has the authority to set bonuses, raises, and compensation for the Chicago Tribune employees. Defendant Alden is aware of the unlawful pay disparities, but failed to and continues to fail to develop compensation policies which rely on permissible

9

criteria for wage disparities. Plaintiffs are informed and believe that Defendant Alden was aware of the unlawful pay disparities when purchasing the Chicago Tribune and had and has the power to correct these inequities as Defendant Alden was ultimately in charge of the centralized group overseeing the Chicago Tribune operations and compensation decisions. Instead, Defendant perpetuates a discriminatory environment that encourages the unlawful pay disparities based on Sex, race, and ethnicity that emerged among Defendants' employees.

36.     The true names and capacities of Defendants named as Does 1-100, inclusive, whether individual, corporate, associate, or otherwise, are unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names.  Plaintiffs will amend this Complaint to show true names and capacities when they have been determined.  Plaintiffs are informed, believe, and, on that basis, allege, that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged in this Complaint and that Plaintiffs' damages as alleged were legally caused by such Defendants. Plaintiffs are further informed and believe that, at all times mentioned, each of such Defendants was the agent, servant, employee, or representative of each of the remaining Defendants and was at all times acting within the scope of such agency or employment.  Plaintiffs allege that Defendants were, at all relevant times, the alter egos and/or the agents of each other.  Wherever reference is made to Defendants herein, it is intended to include all of the named Defendants as well as the Doe defendants. Each of the fictitiously named Doe defendants is responsible for the occurrences herein alleged and proximately caused Plaintiffs damages.

## CLASS ACTION ALLEGATIONS

37.     Plaintiffs bring this action on behalf of themselves and all others similarly situated as a class action pursuant to Federal Rules of Civil Procedure Rule 23, on behalf of the following classes (collectively "Plaintiff Classes.")

38.     With respect to their federal and state intentional discrimination claims and disparate impact/disparate effect claims, the classes that Plaintiffs seek to represent are composed of and defined as follows ("Discrimination Classes"):

      a. **Title VII and IHRA Sex Class:**  All non-managerial female employees who work(ed) for Defendants in Illinois at any time 300 calendar days before May 15, 2024, the date Plaintiffs exhausted their administrative remedies, until the final judgment;

      b. **Title VII and IHRA Race Class:**  All non-managerial Black and/or African American employees who work(ed) for Defendants in Illinois at any time 300 calendar days before May 15, 2024, the date Plaintiffs exhausted their administrative remedies, until the final  judgment;

39.     With respect to their Illinois state Equal Pay Act sex-based claim, the classes that Plaintiffs seek to represent are composed of and defined as follows ("State Sex-Based Equal Pay Act Classes"):

      c. **State Sex-Based Reporter Class:** All female employees who work(ed) for Defendants in Illinois in a Reporter Covered Position (defined above) at any time within five (5) years prior to the filing of this Complaint until the final judgment (referred to as the "State Sex-Based Reporter Class");

      d. **State Sex-Based Editor Class:** All female employees who work(ed) for Defendants in Illinois in an Editor Covered Position (defined above) at any time within five (5) years prior to the filing of this Complaint until the final judgment (referred to as the "State Sex-Based Editor Class");

      e. **State Sex-Based Photojournalist Class:** All female employees who work(ed) for Defendants in Illinois in a Photojournalist

Covered Position (defined above) at any time within five (5) years prior to the filing of this Complaint until the final judgment (referred to as the "State Sex-Based Photojournalist Class");

40.     With respect to their Illinois state Equal Pay Act race-based claims, the classes that Plaintiffs seek to represent are composed of and defined as follows ("Race-Based Equal Pay Act Classes):

     f.  **Race-Based Reporter Class:** All Black or African American employees who work(ed) for Defendants in Illinois in a Reporter Covered Position (defined above) at any time within five (5) years prior to the filing of this Complaint until the final judgment (referred to as the "Race-Based Reporter Class");

     g.  **Race-Based Editor Class:** All Black/African American employees who work(ed) for Defendants in Illinois in an Editor Covered Position (defined above) at any time within five (5) years prior to the filing of this Complaint until the final judgment (referred to as the "Race-Based Editor Class");

     h.  **Race-Based Photojournalist Class:** All Black/African American employees who work(ed) for Defendants in Illinois in a Photojournalist Covered Position (defined above) at any time within five (5) years prior to the filing of this Complaint until the final judgment (referred to as the "Race-Based Photojournalist Class").

41.     The members of the Plaintiff Classes are so numerous that joinder of all members would be unfeasible and impracticable. The membership of the Plaintiff Classes is greater than 50 individuals, but the identity of such membership is readily ascertainable via inspection of the personnel records and other documents maintained by Defendants.

42.     There are common questions of law and fact as to members of the Plaintiff Classes which predominate over questions affecting only individual members, including, without limitation:

A.     Whether Defendants denied Plaintiffs and members of the Plaintiff Classes equal wages for substantially equal or substantially similar work to which they are entitled pursuant to the state Equal Pay Act without legal justification as defined in the statute;

B.     Whether Defendants' failure to compensate female employees at a level commensurate with comparable male employees was willful within the meaning of the state Equal Pay Act;

C.     Whether Defendants' failure to compensate Black/African American employees at a level commensurate with comparable employees who are not Black/African American was willful within the meaning of the state Equal Pay Act;

D.     Whether Defendants' centralized policies and practices intentionally discriminate against women and African American employees with respect to pay;

E.     Whether Defendants' centralized policies and practices have a disparate impact and disparate effect on women and African American employees with respect to pay;

F.     The effect upon and the extent of damages suffered by members of the Plaintiff Classes and the appropriate amount of compensation.

43.     Plaintiffs' class action claims and the relief they seek are typical of the claims and relief necessary to remedy the claims of all members of the Plaintiff Classes as they arise out of the same course of conduct and are predicated on the same violation(s) of the law. Plaintiffs, as representative parties, will fairly and adequately protect the interests of the classes by vigorously pursuing this suit

through their attorneys who are skilled and experienced in handling matters of this type.

44.     Plaintiffs, on behalf of themselves and as Class Representatives for the Plaintiff Classes, seek the following relief for their individual claims and for those of the members of the proposed Classes: (a) a declaratory judgment that Defendants have engaged in systemic Sex and racial discrimination against the Classes by paying female and/or African American employees less than their male or non-African American counterparts for substantially equal or substantially similar work; by (b) a permanent injunction against such continuing discriminatory pay practices, policies, and procedures; (c) injunctive relief that effectuates a restructuring of Defendants' compensation policies, practices, and procedures; (d) the unpaid balance of wages owed, plus interest on that amount, (e) liquidated damages; (f) compensatory damages; (g) attorneys' fees, costs, and expenses; (h) statutory and civil penalties; and (i) other equitable remedies necessary to make the female and minority employees whole from Defendants' discrimination.

45.     The nature of this action and the nature of the laws available to the Plaintiff Classes make use of the class action format, a particularly efficient and appropriate procedure to afford relief to members of the Plaintiff Classes.  Further, this case involves a corporate employer and a large number of individual employees possessing claims with common issues of law and fact.  If each employee were required to file an individual lawsuit, the corporate Defendants would necessarily gain an unconscionable advantage because they would be able to exploit and overwhelm the limited resources of each individual plaintiff with their vastly superior financial and legal resources. Requiring each class member to pursue an individual remedy would also discourage the assertion of lawful claims by employees who would be disinclined to pursue an action against their present and/or former employer for an appreciable and justifiable fear of retaliation and

14

permanent damage to their careers at present and/or subsequent employment. Proof of a common business practice or factual pattern, of which the named Plaintiffs experienced, is representative of the Plaintiff Classes and will establish the right of each of the members of the Plaintiff Classes to recovery on these alleged claims.

46.     The prosecution of separate actions by the individual members of the Plaintiff Classes, even if possible, would create: (a) a substantial risk of inconvenient or varying verdicts or adjudications with respect to the individual members of the Plaintiff Classes against the Defendants; and/or (b) legal determinations with respect to the individual members of the Plaintiff Classes which would, as a practical matter, be dispositive of the other class members' claims who are not parties to the adjudications and/or would substantially impair or impede the ability of class members to protect their interests. Further, the claims of the individual members of the Plaintiff Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the associated concomitant costs and expenses.   Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## FLSA COLLECTIVE ACTION ALLEGATIONS

47.     Plaintiffs bring FLSA claims on behalf of the following categories of similarly situated individuals who worked for Defendants (collectively "Federal Sex-Based Classes"):

a.  **Federal Sex-Based Reporter Class:**  All female employees who work(ed) for Defendants in Illinois in a Reporter Covered Position (defined above) at any time within three (3) years prior to the filing of this Complaint until the final judgment (referred to as the "Federal Sex-Based Reporter Class");

b. **Federal Sex-Based Editor Class:** All female employees who work(ed) for Defendants in Illinois in an Editor Covered Position (defined above) at any time within three (3) years prior to the filing of this Complaint until the final judgment (referred to as the "Federal Sex-Based Editor Class");

c. **Federal Sex-Based Photojournalist Class:** All female employees who work(ed) for Defendants in Illinois in a Photojournalist Covered Position (defined above) at any time within three (3) years prior to the filing of this Complaint until the final judgment (referred to as the "Federal Sex-Based Photojournalist Class");

48. Defendants are liable under the FLSA for failing to properly compensate Plaintiffs in accordance with the Federal Equal Pay Act, 29 U.S.C. § 206(d), and therefore, notice should be sent to the members of the FLSA Class. The members of the FLSA Class would benefit from issuance of a court supervised Notice of the present lawsuit and the opportunity to join in the present lawsuit. Members of the FLSA Class are known to Defendants, are readily ascertainable and can be located through Defendants' records.

**FACTS COMMON TO ALL CAUSES OF ACTION**

49. The Chicago Tribune maintains a systemic and company-wide pay gap, wherein women and African American employees are compensated significantly less than their male and non-African American colleagues. The chasm that divides female and African American employees from the rest of the newsroom stems from Defendants' common employment policies and practices, that are neither job-related, nor justified by business necessity. There remains a lack of transparency, inadequate standards and controls, and inadequate opportunities for redress, which perpetuate pay disparity at the Tribune and ensure that female and African American employees remain at the bottom of the

16

compensation ladder without any meaningful opportunity for pay equity. In fact, the Tribune has, in the last few years, awarded particular female and African American employees pay raises couched as "pay equity" raises. Yet, even after receiving "pay equity" raises, those individuals remain woefully underpaid compared to their male and/or non-African American colleagues. For example, Plaintiff Christy Gutowski received a "pay equity" raise in September 2023. She was given an additional $8,500. Her male co-worker, with almost 20 years' less experience, is still making nearly $10,000 more than Plaintiff Gutowski.

50. Defendants maintain a series of policies and practices that creates and maintains a wage gap between male and female employees and between African American and non-African American employees.

51. Defendants' policies and practices include the use of diversity outreach programs like MetPro to recruit talented journalists but pay them at depressed rates. MetPro, internally known as the "affirmative action" program, paid its non-white participants significantly lower salaries than their white full-time colleagues. Similarly, the Residency program was a two-year program implemented by the Tribune to recruit talented journalists on a temporary basis, with a potential for full-time employment after the Resident-term expires. Residents are given significantly lower rates of compensation than their full-time colleagues and are given the least-desirable assignments (for example, an overnight crime beat). The Tribune hired mostly female and/or non-white journalists into Resident positions. As such, Residents (mostly female and/or non-white journalists) are often paid significantly less than their similarly-situated colleagues who perform substantially similar job duties. If the Resident is hired into a full-time position at the expiration of their temporary Resident-term, their modest Resident compensation anchors their full-time employment offer to a significantly lower starting point than their full-time colleagues who did not start in the

Residency program – resulting in a stark gap between the salaries of male or white reporters and the depressed salaries of the female or African American reporters hired through the Residency program. Overall, the Residency program and MetPro[2] were a source of "cheap labor" that the Tribune used to depress the salaries of otherwise highly qualified female and/or non-white journalists. While the Residency and MetPro programs were eventually discontinued in or around July of 2020, the stark wage gaps caused by this practice remain.

52.     Defendants also regularly rely on Community or Local Suburban papers Newspapers to hire and recruit women and African American employees. Defendants intentionally maintain this practice because Defendants know that the Suburban papers maintain depressed salaries for their journalists, ensuring that Defendants can hire "cheap labor" by perpetuating the low salary history. On the other hand, Defendants recruit and hire male and non-African American employees from major news publications and outlets where salary offers are significantly higher and competitive in order to induce acceptance of employment offers.

53.     Defendants also impermissibly rely on salary history to justify paying their female and non-African American employees less based on the employee's prior salary, thus perpetuating a systemic pay gap. *See* 820 ILCS 112/10(b-5).

54.     Defendants prohibit their employees from discussing their salaries or compensation with each other in violation of state law. *See* 820 ILCS 112/10(b). The cloud of secrecy fostered by Defendants was a deliberate attempt to conceal the extensive wage gap between female and African American employees versus their male and white counterparts.

---

[2] In Los Angeles, an Assistant Managing Editor employed by Tribune Publishing Company, a white male, admitted that MetPro was a pool for cheap labor through which Defendants could underpay seasoned minority journalists.

**Plaintiff Buckley**

55.     Plaintiff Madeline Buckley is a white woman who is currently employed by the Chicago Tribune as a Senior Reporter. Buckley received her B.A. in 2011 from the University of Notre Dame, where she spent four years on staff at the campus newspaper.  Thereafter, she worked for various publications, including the Brownsville Herald, a small paper on the Texas-Mexico border, the South Bend Tribune, and the Indianapolis Star, where she covered criminal justice.

56.     She began working for the Chicago Tribune in 2017 under their "Residency" program, described above.

57.     The Tribune hired Plaintiff Buckley into a two-year termed Resident position at a significantly lower rate than her full-time male colleagues who had the same or less experience than her.  Plaintiff Buckley was eager to get her foot in the door at a large paper like the Tribune. She started on the overnight crime beat, working from 10:00 p.m. to 8:00 a.m. responding to crime scenes, mostly homicides and shootings, in as close to as real time as possible. Buckley's assignment was dangerous and traumatic; she often put her safety on the line to report for the Tribune. For example, during one shift Buckley was carjacked while reporting for the Tribune on its overnight crime beat. Buckley's reporting allowed the Tribune to give the public an on-the-ground picture of events that otherwise would not have been reported.

58.     After a year on the overnight crime beat, the Tribune moved Plaintiff Buckley to a dayside assignment as a general assignment reporter, concentrating on breaking news and advancing enterprise stories. In October 2022, the Tribune promoted Buckley to Criminal Courts beat reporter, a high profile beat at the paper.

59.     Since starting with the Chicago Tribune, Buckley has covered criminal justice and is dedicated to writing stories that shine a light on injustices,

such as stories about people who were wrongfully convicted or unjustly sentenced then later released.

60. Buckley has received numerous awards for her journalism including the Anne Keegan award in 2021, which honors journalists for their writing and "exhibiting compassion, character, and courage while telling stories that touch the human heart." Of Buckley's work, the judges wrote: "time and again, through reporting and compelling prose, she demonstrated the importance – and beauty – of writing about the common man." Among Plaintiff Buckley's other awards are the Illinois Press Association Award for Feature writing/personality profile in 2022 and the Peter Lisagor award for best investigative reporting for series on domestic violence in 2019.

61. Since the Tribune hired Buckley in 2017, Buckley has received just two pay raises. Based on her own investigation and discussions with others, Buckley learned she was paid significantly less than her male peers for substantially equal or similar work performed under similar working conditions when viewed as a composite of skill, effort, and responsibility. This pay disparity is not based on merit, years of industry experience, or even time worked at the Tribune. Buckley's salary as a resident anchored her compensation to an unfair and unjust salary rate well-below that of her similarly-situated male colleagues. There is no legitimate, lawful reason that accounts for the pay disparity.

**Plaintiff James**

62. Plaintiff Terrence James is an African American male who is currently employed by the Chicago Tribune as a photojournalist. James has worked as a photojournalist for thirty-one (31) years. After working for Bergen Record in New Jersey for five years, James came to the Tribune in 1998. Despite his significant accomplishments and tenure at the Tribune, James has received only one significant pay raise since his hire.

20

63.     James covers assignments for every section of the newspaper from breaking news, to restaurant reviews, to sports. Since starting at the Tribune, James has been awarded two Lisagor awards, two Beck awards (the company's own award for outstanding professional performance), and was part of a staff Pulitzer Prize for "Gateway to Gridlock," a series on the chaotic American air traffic system. He has covered international stories including the AIDS crisis in Rwanda and youth baseball in the Dominican Republic. He has also covered long-term projects including the 50th anniversary of the 1968 riots in Chicago, the history of the Underground Railroad in Illinois, and the devastating impact of gun violence in Chicago. James is also one of the few bilingual (English/Spanish) photographers on staff, a vital asset in a city with a large Spanish-speaking population. When video storytelling was a priority at the Tribune, James made himself one of the most adept staffers at shooting, editing and producing content for the Web. He created a pioneering online photojournalism magazine and as a result was selected to be a judge in a national photojournalism contest.

64.     James is the only African American photojournalist currently at the Tribune. There has only been a handful of African American photojournalists hired by the newspaper since 1998.

65.     Based on his discussions with others, Plaintiff learned he was paid less than non-African American employees for substantially equal or similar work performed under similar working conditions, when viewed as a composite of skill, effort, and responsibility. Specifically, a number of non-African American photojournalists with less experience and industry recognition are making substantially more money than Plaintiff James despite performing substantially similar work. There is no legitimate, lawful reason which accounts for the pay disparity.

**Plaintiff Wescott**

66.     Plaintiff Stacey Wescott is a white female photojournalist at the Chicago Tribune. Wescott received her B.A. in 1993 from the University of Minnesota in Photojournalism, Latin American Studies, and Spanish. She received two fellowships from the University of Minnesota and spent two and a half years in Latin America.

67.     Wescott began in the Residency program. As a Resident, Wescott, like Plaintiff Buckley, was compensated at a rate significantly lower than her similarly-situated male peers. Her salary as a resident has anchored her salary rate and continues to keep Wescott in the lowest echelons of the pay ladder.

68.     From 1999 until 2010, Wescott spent ten years photographing a wide-array of subjects for a variety of sections at the Tribune including breaking news, news, features, sports, business, and investigative projects.

69.      In 2010, Wescott was promoted to a Photo Bureau Chief position and managerial responsibilities were added to her job position. She worked side-by-side with the Bureau Chief to increase local news coverage and collaborated with editors and reporters to pitch stories and coordinate visuals for upcoming stories and projects. Wescott assigned photo work to staff photographers and hired freelance photographers. She also evaluated and mentored new photo residents. Lastly, Wescott worked the photo assignment desk on Sunday mornings where she and the metro editor led the newsroom in making decisions about breaking news coverage and daily assignments.

70.     In 2018, when all of the bureaus closed and work was re-centralized to the Tribune Tower, Wescott continued her work as a photojournalist continuing to exercise many of the leadership skills she had acquired in her position as Photo Bureau Chief. This included pitching several stories each year on a wide variety of subjects. Wescott's supervisors have praised her for being a "top journalist" on the

photography because she covers stories like both a photographer and a reporter would. She often generates Page 1 story ideas – a responsibility primarily assumed by reporters – and often finds information, sources and details that are used in the written stories.

71.    In her nearly twenty-five (25) years at the Tribune, Wescott has received several awards including, but not limited to, a staff Pulitzer Prize for explanatory journalism in 2001, several Outstanding Performance and Beck Award, National Press Club award in 2017, Lisagor Awards in 2016, 2017, 2018, and again in 2023, and the Illinois Press Association award for community service and news reporting.

72.    Wescott is regularly assigned to work on the highest-profile investigations, breaking news, and feature stories because of her photographic talent and the contributions she makes to the reporting efforts. Some recent examples include the "Tylenol Murders" and "Failure to Protect." Wescott is known for being one of the newsroom's top collaborators, a multi-talented journalist whose reporting skills enhance the written stories paired with her visual journalism. These collaborations have been honored by, among others, the Pulitzers, the National Headline Club, the Society of Professional Journalists, the National Press Awards, IRE, the Dart Awards, the Chicago Headline Club, the Chicago Journalists Association and the Illinois Press Association, among others.

73.    In a newsroom with few female photographers, Wescott is often relied upon to photograph sensitive stories involving women and children, including topics of abortion, sexual assault, death and dying. She is entrusted to work with subjects to explain the process, hear their concerns, and construct a photo plan, all in keeping with ethical photojournalistic practices and trauma-informed journalism. Her empathetic demeanor and transparency have opened many doors for Tribune projects and allowed them to gain trust and access to sources

imperative to their stories. Her approach has made a significant contribution to critical projects, including an award-winning series on postpartum depression, investigations into the deaths of children under the state's care and, most recently, a series on women who have been sexually abused by their medical provider and then re-traumatized by the bureaucracy involved in holding them to account.

74.     Wescott is bilingual, having worked and studied in several Spanish-speaking countries. This skill is particularly critical in a metropolitan area where nearly 17 percent of the population are native Spanish speakers. Assignment editors at times take advantage of her language skills, sending her to assignments with reporters who only speak English and then rely upon her to translate interviews for them.

75.     Wescott is one of three FAA certified drone pilots on the photo staff, a skill that is used regularly in breaking news situations and to enhance department visuals.

76.     Despite her success and tenure at the Tribune, all but one male photojournalist at the Tribune has a higher salary than Wescott, including male employees with fifteen fewer years' experience. The Tribune has given Wescott only a few small raises since her hire in 1999, which has left her floundering at the bottom of the pay scale given her experience. The Tribune has not given Wescott a raise in seven years.

77.     Through her own investigation and discussions with others, Wescott became aware of the wide-spread systemic wage disparity at the Tribune. Wescott is one of the lowest paid visual journalist, except for a recent 2023 hire and one other male. Wescott reported the pay disparity to newsroom leadership in 2023 detailing that she was underpaid in comparison to some of her male colleagues, even those with less experience and requesting that the Tribune easily remedy the

circumstances by ensuring equitable compensation be swiftly enacted. No corrective action was taken.

78.     Wescott is being paid significantly less than her male peers for substantially equal or similar work performed under similar working conditions when viewed as a composite of skill, effort, and responsibility. Wescott's salary as a resident anchored her compensation to an unfair and unjust salary rate well-below that of her similarly situated male colleagues. There is no legitimate, lawful reason that accounts for the pay disparity.

**Plaintiff Kujawa**

79.     Plaintiff Colleen Kujawa – a woman – currently works at the Chicago Tribune as an Opinion Content Editor. Plaintiff Kujawa graduated from Purdue University in 2000 and worked at Calumet Press/WJOB-AM 1230 for five years, first as a circulation manager and then as an assistant editor. Thereafter, Plaintiff Kujawa worked as a freelance community correspondent and then full-time copy editor at the Times of Northwest Indiana from 2006 until 2012.

80.     The Tribune hired Plaintiff Kujawa in June 2012 as a metro copy editor, where she was responsible for editing and fact-checking stories and coordinating with reporters, source editors, and slot editors to correct and finalize stories for the Tribune. The Tribune repeatedly chose Kujawa to serve as the dedicated copy editor for the investigative team on special investigative series, and to train new copy editors.

81.     The Tribune hired Plaintiff Kujawa from a local suburban paper in neighboring northwest Indiana, where Plaintiff Kujawa's salary was depressed, as described above. By using her salary history to evaluate her suitability for a position and to set her Tribune salary, the Tribune perpetuated past discrimination. In other words, this practice forced Plaintiff Kujawa and other women and African American employees to carry pay discrimination with them from job to job.

82. In October 2014, Plaintiff Kujawa was promoted to a digital content editor position, where she was responsible for digital publication.

83. Plaintiff Kujawa assumed her current role in January 2019. She is responsible for selecting, editing, and fact-checking letters to the editor and op-eds and, in turn, is one of the people responsible for the topicality and overall balance of the content published in the Tribune's opinion section.

84. The Tribune has repeatedly recognized Kujawa's professional performance, in 2017, 2019, and 2023 awarding her the Jones-Beck Award for professional performance.

85. Twice in 2023, Kujawa's supervisor acknowledged that Kujawa is, in fact, underpaid. Yet, no remedial action has been taken. Since hiring Kujawa twelve years ago, the Tribune has given her just two raises, leaving her woefully underpaid compared to her male colleagues.

86. Plaintiff learned that she was paid less than male employees for substantially equal or similar work performed under similar working conditions, when viewed as a composite of skill, effort, and responsibility. Specifically, a number of male editors with less experience and industry recognition are making substantially more money than Plaintiff Kujawa despite performing substantially similar work. There is no legitimate, lawful reason which accounts for the pay disparity.

**Plaintiff Williams**

87. Plaintiff Deanese Williams (preferred name Williams-Harris) is an African American woman, currently employed by the Tribune as a Deputy Senior Content Editor. Williams-Harris received her Bachelor's degree from Southern Illinois University in 2006, and her Master of Arts Public Affairs Reporting from University of Illinois Springfield in 2007.

26

88.     Williams-Harris was hired at the Tribune in October 2007 as a Metpro Resident. Williams-Harris started reading the Tribune when she was just four years old. Getting a position, even as a Resident, was a dream come true. Williams' parents grew up in the Robert Taylor Housing Projects, and Williams' family moved to the North Side of Chicago as a part of the state's section eight program in the late 70s. As an African American woman whose parents grew up in the Robert Taylor housing projects, Williams-Harris felt like she had a responsibility to give a voice to the voiceless in her community and report on stories that were not otherwise told. As a MetPro Resident, however, Williams-Harris' reality was much different; she was made to feel like the "affirmative action hire" and was treated like a lower-tier worker. Despite the disparate treatment in the newsroom, Williams-Harris landed some Page One stories as a Resident, rotating between several different newsroom desks.

89.     In 2009, Williams-Harris' two-year term was set to expire, and the Tribune offered her a position covering breaking news and violent crime as an overnight reporter. Williams-Harris sacrificed time with her children and rearranged her life so that she could continue working at the Tribune. In return, she was given a $7,000 raise, the first of only three raises that Williams-Harris received in her almost seventeen years at the Tribune. On the overnight desk, Williams-Harris worked travelling to dangerous parts of the City reporting on violent crime. She was regularly recognized for breaking stories that otherwise would have remained underreported.

90.     Around 2010, Williams-Harris helped establish the Tribune's breaking news desk, which significantly improved website traffic and made the newsroom more agile than it had ever been. The job came with some of the most undesirable shifts in the newsroom - overnights and weekends - but the work was necessary to reposition the Tribune as a modern, 24-hour-a-day news operation.

27

91.    In 2011, several members of the breaking news desk, including Williams-Harris, were part of a team that was named Pulitzer Prize finalists for coverage of a blaze in which two firefighters were killed.

92.    Williams-Hariis' work on the breaking/emerging news desk has helped win multiple Lisagors and Illinois Press Association Awards for the Chicago Tribune.

93.    She also was honored by the company with two Beck awards in recognition of her "outstanding professional performance." Her most recent award - nominated by her peers and selected by management - came in 2022 "for her ability to generate valuable news leads, the leadership she has shown on the breaking news desk and her writing for and about Chicago's Black community."

94.    Williams-Harris was transferred to the Crime and Justice breaking news desk in or around 2011, and then to the "People's Desk" in 2020.  In 2023, Williams-Harris was promoted to a Deputy Senior Content Editor in recognition of her skills and contributions to the Tribune.  She was awarded increased responsibility and job duties without appropriate compensation to match.  Non-African American and/or male employees in the same or substantially similar position as Williams-Harris with significantly less experience are paid more than Williams-Harris.  Williams-Harris is the second lowest paid deputy senior content editor.  The only editor who makes less than her is a 24-year-old early career editor who is only making $2,000 less.

95.    Plaintiff learned through her own investigation and discussions with others that she was paid less than non-African American and/or male employees for substantially equal or similar work performed under similar working conditions, when viewed as a composite of skill, effort, and responsibility.  There is no legitimate, lawful reason which accounts for the pay disparity.

**Plaintiff Rockett**

96.     Plaintiff Darcel Rockett is an African American woman employed by the Tribune as a Senior Reporter.  Rockett has been a writer since she learned to write.  She was first published at the age of seven.  Rockett graduated from the University of Chicago with her B.A. in 1997, and from Columbia University with a M.S. in Journalism in 1998.

97.     Rockett worked for the Associated Press as a Correspondent, the Star Newspapers as a Staff Writer, and Go Magazine as an Assistant Editor before starting with the Tribune in May 2008. From 2008 until December 2009, Rockett handled breaking news, online content, and acquired video and images for the entertainment site, Zapit, a Tribune entity. Thereafter, Rockett worked for CBS 2 Chicago as a Web Producer from 2006 until 2010, when she returned to the Tribune as a Digital News Editor.

98.     As a Digital News Editor, Rockett worked on breaking news stories and long-form feature articles. Rockett was responsible, in part, for determining the content of the Tribune website homepage and for reader engagement numbers.

99.     In May 2017, Rockett was promoted to Senior Journalist, responsible for finding and developing articles for a variety of topics from health to real estate to breaking news. That same year, Rockett received her first of three Beck Awards–this one for Outstanding Professional Performance. She received another for her COVID-19 coverage in 2021 (she was a part of the team that held community conversations via Zoom with community leaders). She was awarded the 2022 Koky Dishon Readership Award, which the company bestows upon the employee whose work grows new and diverse audiences. The Illinois Press Association and the Chicago Headline Club have also recognized Rockett's feature writing and reporting on race and diversity. But the latest feather in her cap is the

29

Studs Terkel Community Media Award, which Public Narrative announced in April 2024.

100. Rockett, as one of very few African American Tribune journalists, feels a unique responsibility to bridge the gap between the paper and communities of color. Rockett is recognized at the Tribune for her thoughtful efforts seeking inclusion for the myriad populations and diverse perspectives in the Chicago area. For example, in September 2023, the Tribune published Rockett's Underground Railroad Project, an on-going series detailing Illinois Underground Railroad historical sites and highlighting the stories of Illinois' freedom seekers and their descendant family narratives.

101. In her 13 years with the Tribune, Rockett has received a single raise. That's in spite of evaluations from former supervisors who said: "Darcel has worked some of the most demanding CT.com shifts and always does a good job managing those tough workloads." "She does a great job prioritizing the myriad tasks confronting her," "good mentor to less experienced digital staff", "has had a hand in many of the past year's SEO successes, and demonstrated right touches on topics, words, and visuals." "Darcel has the ability to do it all." "She can tackle most jobs in a newsroom." She's a self-starter that requires limited oversight." "She's a wordsmith who shines." Rockett remains woefully underpaid compared to her non-African American and/or male peers. Plaintiff learned through her own investigation and discussions with others that she was paid less than non-African American and/or male employees for substantially equal or similar work performed under similar working conditions, when viewed as a composite of skill, effort, and responsibility. There is no legitimate, lawful reason which accounts for the pay disparity.

**Plaintiff Gutowski**

102. The Tribune hired Plaintiff Christy Gutowski in October 2010 as a Senior Reporter. Gutowski graduated from Southern Illinois University in 1993 with a B.S. in Journalism and received her M.A. in Public Affairs Reporting from the University of Illinois in 1994. She spent 16 years at a suburban Chicago newspaper, where plaintiff was consistently promoted and regularly competed with the Tribune on stories involving some of the Chicago area's biggest crimes and criminal trials. The Tribune recruited and hired Gutowski, in part, for her deep knowledge of legal affairs and her unrivaled sourcing. Plaintiff learned through her own investigation and discussions with others that one other man with similar experience hired for the suburban watchdog team at about the same time was paid significantly more than she was, despite her formidable record of legal affairs reporting.

103. In October 2010, Plaintiff Gutowski started with the Tribune's Suburban Watchdog Team, where she was responsible for writing short-term investigative stories that exposed public corruption, safety lapses in the state's child-welfare systems, and true-crime narratives.

104. In 2018, Gutowski was promoted to the investigations team, one of the most highly skilled reporting teams, with an eye on exposing injustice, corruption, and other wrongdoing that impact taxpayers and vulnerable populations of society. Her salary remained anchored by her work on the Suburban Watchdog Team.

105. Gutowski has excelled in her reporting for the paper, as reflected in written performance reviews, praise filled emails, and awards. Her editors have nominated her for a Pulitzer Prize on six different occasions and have presented her with seven internal company awards since 2011.

106.    Gutowski played a key role in the Tribune's first news podcast, "16 Shots," in which the Tribune partnered with the local public radio station in 2018 to take an in-depth look at the fatal shooting of a Black teenager by a white Chicago police officer. Gutowski's exclusive interview with the officer and access to confidential records were pivotal for the podcast, which won an Amnesty International Media Award, a National Headliner Award and a Lisagor Award in 2019.

107.    Gutowski also co-hosted and reported the Chicago Tribune's first narrative podcast "Unsealed: The Tylenol Murders" in 2022, which the newsroom sold to a distributor. Within the first four months, the podcast was among the Top 15 most listened to podcasts in the country and had resulted in roughly 1 million downloads. The podcast made national headlines for its exclusive reporting, prompting Gutowski's appearance on the "Today" show. Apple Podcasts included "Unsealed" on its lists of "Shows That Got Us Hooked."

108.    Gutowski also reported and co-wrote a six-part series that ran in the Chicago Tribune and continues to draw new subscribers. The series and podcast have received numerous awards, including top honors from the Chicago Journalists Association, Chicago Headline Club and the Illinois Press Association, and second-place honors from the national Headliners Awards in 2023.

109.    Gutowski has received about two dozen other prestigious journalism awards in her 30-year career, including a 2023 Chicago Journalists' Association first place honor for her feature on a murdered homeless man, a 2019 Chicago Bar Association Kogan Media Award for team coverage of the historic trial into the teen's police-involved fatal shooting, a 2013 national Anna Quindlen Award and a 2012 Chicago Headline Club-Driehaus Foundation Watchdog Award Excellence in Public Interest for her series about abused, impoverished children and teens. In addition to being an award-winning journalist, Gutowski is often tapped in the

newsroom to jump into breaking news stories and difficult investigations that are stalled, in need of bullet proofing or otherwise need help getting across the finish line. Gutowski is a trusted newsroom mentor and co-organizer of a staff monthly training program and the paper's annual internal awards program.

110. Gutowski has made numerous expert appearances on radio, podcasts and local and national television programs and cable documentaries. She is also often asked to speak to journalism students. All of which helps promote the Tribune's brand.

111. In her almost fourteen years at the Tribune, Gutowski has received two raises. Male journalists with substantially similar job duties and significantly less experience (both industry experience and at the Tribune) than Gutowski are paid more.

112. Plaintiff Gutowski is paid less than males who perform substantially equal or similar work under similar working conditions when viewed as a composite of skill, effort, and responsibility. There is no legitimate, lawful reason that accounts for the pay disparity.

## FIRST CAUSE OF ACTION

### VIOLATION OF FEDERAL EQUAL PAY ACT (29 USC § 206(d))

### (On Behalf of Plaintiffs Buckley, Wescott, Kujawa, Williams, Rockett, and Gutowski and the Federal Sex-Based Reporter, Editor, and Photojournalist Classes Against All Defendants)

113. Plaintiffs reallege Paragraphs 1 through 112 and incorporate them by reference as though fully stated herein as part of Plaintiffs' First Cause of Action of this Complaint.

114. The Federal Equal Pay Act, 29 U.S.C. § 206(d), prohibits employers from discriminating, "between employees on the basis of sex" by paying women less than men for "equal work on jobs the performance of which requires equal

skill, effort, and responsibility, and which are performed under similar working conditions."

115.  Defendants were "employers" under the Federal Equal Pay Act. 29 U.S.C. § 203(a), (d).

116.  Plaintiffs and Plaintiffs' proposed Sex-Based Equal Pay classes were Defendants' employees under the Federal Equal Pay Act. 29 U.S.C. § 203(e)(1).

117.  Defendants discriminated against Plaintiffs and Plaintiffs' proposed Federal Sex-Based Equal Pay classes on the basis of sex by paying Plaintiffs and Plaintiffs' proposed Sex-Based Equal Pay classes less than male employees performing "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d).

118.  The difference in pay is not based on (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a bona fide job-related factor other than sex.

119.  As a direct and proximate result of Defendants' discrimination against them, Plaintiffs and Plaintiffs' proposed Federal Sex-Based Equal Pay classes suffered damages. Each and every time they receive a paycheck infected by the discriminatory pay discrepancy, Plaintiffs and Plaintiffs' proposed Federal Sex-Based Equal Pay classes experienced and continued to experience harm.

120.  The pay policies and practices that resulted in unequal pay for members of the Federal Sex-Based Equal Pay Act classes began before the statute of limitations period and continued and caused injury/damages within the statute of limitations period.

121.  Defendants had and have no "good faith" basis for paying Plaintiffs and Plaintiffs' proposed Federal Sex-Based Equal Pay classes less than her male colleague for equal work and lacked any reasonable basis for believing that their

conduct was legal. Therefore, liquidated damages are appropriate. 29 U.S.C. §§ 216(b), 260.

122.  Defendants repeatedly and willfully violated the Federal Equal Pay Act. Plaintiffs and Plaintiffs' proposed Federal Sex-Based Equal Pay classes, therefore, may commence their action within three years after the cause of action accrued.  29 U.S.C. § 255. And Defendants are, therefore, subject to a civil penalty for each violation. 29 U.S.C. § 216(e)(2).

**SECOND CAUSE OF ACTION**

**SEX DISCRIMINATION**

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 USC § 2000e-2(a))**

**(On Behalf of Plaintiffs Buckley, Wescott, Kujawa, Williams, Rockett, and Gutowski and the Title VII Sex Class Against All Defendants)**

123.  Plaintiffs reallege Paragraphs 1 through 122 and incorporate them by reference as though fully stated herein as part of Plaintiffs' Second Cause of Action of this Complaint.

124.  Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended, makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

125.  Defendants treated and treat Plaintiffs and Plaintiffs' proposed Title VII Sex Class less favorably than other individuals outside of their protected class (female), including by maintaining policies and practices that created and maintained disparate pay between Defendants' female and male employees.

126.  Plaintiffs' sex and the sex of Plaintiffs' proposed Title VII Sex Class was a motivating factor for the disparity in pay they received for performing the

same or substantially similar work as male employees who received more or higher compensation than Plaintiffs and Plaintiffs' proposed Title VII Class.

127. Defendants' policies and practices including: (1) use of diversity outreach programs like MetPro as well as Residency Programs to recruit talent but pay at depressed rates; (2) hiring and recruiting women and African American employees from Community or Local Suburban papers Newspapers, where Defendants anchor offers to depressed salary rates, while recruiting white and male employees from major papers where Defendants offer competitive market salaries; (3) reliance on salary history; and (4) encouraging and maintaining a culture of pay secrecy, have an unlawful disparate impact on female employees. Further, when evidence of unlawful pay disparities was brought to management's attention, appropriate, remedial actions such as conducting a pay audit or job leveling analysis were refused. The aforementioned practices constitute evidence of intentional discrimination or, at a minimum, create a disparate impact/disparate effect on women and do so without a legitimate business justification.

128. Plaintiffs and Plaintiffs' proposed Title VII Sex Class were harmed as a result of Defendants' conduct, which was a substantial factor in causing Plaintiffs and Plaintiffs' proposed Title VII Sex Class' harm.

129. Economic damages. As a direct and legal result of Defendants' conduct, Plaintiffs and Plaintiffs' proposed Title VII Sex Class have and will suffer damages for lost earnings and unpaid wages in an amount not yet fully known, but in excess of the jurisdictional limits of this Court.

130. Non-Economic damages. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiffs and Plaintiffs' proposed Title VII Sex Class has and will suffer emotional distress, humiliation, shame, and embarrassment in an amount to be proven at time of trial.

131. The pay policies and practices that resulted in unequal pay for members of the Title VII Sex Class began before the statute of limitations period and continued and caused injury/damages within the statute of limitations period.

132. Defendants' actions constituted a willful violation of the above-mentioned laws. As a direct result, Plaintiffs and Plaintiffs' proposed Title VII Sex Class have and will continue to suffer substantial losses related to the loss of wages, and they are entitled to recover costs, expenses, and attorney's fees in seeking to compel Defendants to fully perform their obligation under the law and its respective damage amounts according to proof at time of trial.

133. Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiffs and Plaintiffs' proposed Title VII Sex Class, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiffs and Plaintiffs' proposed Title VII Sex Class. Plaintiffs and Plaintiffs' proposed Title VII Sex Class are thus entitled to recover punitive damages from Defendants in an amount according to proof.

### THIRD CAUSE OF ACTION

### RACE DISCRIMINATION

### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 USC § 2000e-2(a))

### (On Behalf of Plaintiffs James, Williams, and Rockett and the Title VII Race Class Against All Defendants)

134. Plaintiffs reallege Paragraphs 1 through 133 and incorporate them by reference as though fully stated herein as part of Plaintiffs' Third Cause of Action of this Complaint.

135. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended, makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1)

136.   Defendants treated Plaintiffs and Plaintiffs' proposed Title VII Race Class less favorably than other individuals outside of their protected class (Black and/or African American), including by maintaining policies and practices that created and maintained disparate pay between Defendants' Black and/or African American and non- Black and/or African American employees.

137.   Plaintiffs' race and the race of Plaintiffs' proposed Title VII Race Class was a motivating factor for the disparity in pay they received for performing the same or substantially similar work as non- Black and/or African American employees who received more or higher compensation than Plaintiffs and Plaintiffs' proposed Title VII and IHRA Race Class.

138.   Defendants' policies and practices including: (1) use of diversity outreach programs like MetPro as well as Residency Programs to recruit talent but pay at depressed rates; (2) hiring and recruiting women and African American employees from Community or Local Suburban papers Newspapers, where Defendants anchor offers to depressed salary rates, while recruiting white and male employees from major papers where Defendants offer competitive market salaries; (3) reliance on salary history; and (4) encouraging and maintaining a culture of pay secrecy, have an unlawful disparate impact on Black/African American employees. Further, when evidence of unlawful pay disparities was brought to management's attention, appropriate, remedial actions such as conducting a pay audit or job leveling analysis were refused.  The aforementioned practices constitute evidence of intentional discrimination or, at a minimum, create a disparate impact/disparate effect on women and do so without a legitimate business justification.

139.   Plaintiffs and Plaintiffs' proposed Title VII Race Class were harmed as a result of Defendants' conduct, which was a substantial factor in causing

38

Plaintiffs and Plaintiffs' proposed Title VII Race Class' harm.

140. Economic damages. As a direct and legal result of Defendants' conduct, Plaintiffs and Plaintiffs' proposed Title VII Race Class has and will suffer damages for lost earnings and unpaid wages in an amount not yet fully known, but in excess of the jurisdictional limits of this Court.

141. Non-Economic damages. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiffs and Plaintiffs' proposed Title VII Race Class have and will suffer emotional distress, humiliation, shame, and embarrassment in an amount to be proven at time of trial.

142. The pay policies and practices that resulted in unequal pay for members of the Title VII Race Class began before the statute of limitations period and continued and caused injury/damages within the statute of limitations period.

143. Defendants' actions constituted a willful violation of the above-mentioned laws. As a direct result, Plaintiffs and Plaintiffs' proposed Title VII Race Class has and will continue to suffer substantial losses related to the loss of wages, and they are entitled to recover costs, expenses, and attorney's fees in seeking to compel Defendants to fully perform their obligation under the law and its respective damage amounts according to proof at time of trial.

144. Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiffs and Plaintiffs' proposed Title VII Race Class, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiffs and Plaintiffs' proposed Title VII Race Class. Plaintiffs and Plaintiffs' proposed Title VII Race Class are thus entitled to recover punitive damages from Defendants in an amount according to proof.

## FOURTH CAUSE OF ACTION

## SEX DISCRIMINATION

## ILLINOIS HUMAN RIGHTS ACT (775 ILCS 5/1-101, *et. seq.*)

## (On Behalf of Plaintiffs Buckley, Wescott, Kujawa, Williams, Rockett, and Gutowski and the IHRA Sex Class Against All Defendants)

145.   Plaintiffs reallege Paragraphs 1 through 144 and incorporate them by reference as though fully stated herein as part of Plaintiffs' Fourth Cause of Action of this Complaint.

146.   The Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq.*, makes it unlawful for "any employer to refuse to hire, to segregate, to engage in harassment . . . or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination . . . ." 775 ILCS 5/2-102(a). "Unlawful discrimination" includes discrimination based on sex. 775 ILCS 5/1-103(Q).

147.   Defendants treated Plaintiffs and Plaintiffs' proposed IHRA Sex Class less favorably than other individuals outside of their protected class (female), including by maintaining policies and practices that created and maintained disparate pay between Defendants' female and male employees.

148.   Plaintiffs' sex and the sex of Plaintiffs' proposed IHRA Sex Class was a motivating factor for the disparity in pay they received for performing the same or substantially similar work as male employees who received more or higher compensation than Plaintiffs and Plaintiffs' proposed IHRA Sex Class.

149.   Defendants' policies and practices including: (1) use of diversity outreach programs like MetPro as well as Residency Programs to recruit talent but pay at depressed rates; (2) hiring and recruiting women and African American employees from Community or Local Suburban papers Newspapers, where

40

Defendants anchor offers to depressed salary rates, while recruiting white and male employees from major papers where Defendants offer competitive market salaries; (3) reliance on salary history; and (4) encouraging and maintaining a culture of pay secrecy, have an unlawful disparate impact on female employees. Further, when evidence of unlawful pay disparities was brought to management's attention, appropriate, remedial actions such as conducting a pay audit or job leveling analysis were refused. The aforementioned practices constitute evidence of intentional discrimination or, at a minimum, create a disparate impact/disparate effect on women and do so without a legitimate business justification.

150. Plaintiffs and Plaintiffs' proposed IHRA Sex Class were harmed as a result of Defendants' conduct, which was a substantial factor in causing Plaintiffs and Plaintiffs' proposed IHRA Sex Class' harm.

151. Economic damages. As a direct and legal result of Defendants' conduct, Plaintiffs and Plaintiffs' proposed IHRA Sex Class have and will suffer damages for lost earnings and unpaid wages in an amount not yet fully known, but in excess of the jurisdictional limits of this Court.

152. Non-Economic damages. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiffs and Plaintiffs' proposed IHRA Sex Class have and will suffer emotional distress, humiliation, shame, and embarrassment in an amount to be proven at time of trial.

153. The pay policies and practices that resulted in unequal pay for members of the IHRA Sex Class began before the statute of limitations period and continued and caused injury/damages within the statute of limitations period.

154. Defendants' actions constituted a willful violation of the above-mentioned laws. As a direct result, Plaintiffs and Plaintiffs' proposed IHRA Sex Class has and will continue to suffer substantial losses related to the loss of wages, and they are entitled to recover costs, expenses, and attorney's fees in seeking to

compel Defendants to fully perform their obligation under the law and its respective damage amounts according to proof at time of trial.

155.  Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiffs and Plaintiffs' proposed IHRA Sex Class, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiffs and Plaintiffs' proposed IHRA Sex Class. Plaintiffs and Plaintiffs' proposed IHRA Sex Class are thus entitled to recover punitive damages from Defendants in an amount according to proof.

**FIFTH CAUSE OF ACTION**

**RACE DISCRIMINATION**

**ILLINOIS HUMAN RIGHTS ACT (775 ILCS 5/1-101, *et. seq.*)**

**(On Behalf of Plaintiffs James, Williams, and Rockett and the IHRA Race Class Against All Defendants)**

156.  Plaintiffs reallege Paragraphs 1 through 155 and incorporate them by reference as though fully stated herein as part of Plaintiffs' Fifth Cause of Action of this Complaint.

157.  The Illinois Human Rights Act, 775 ILCS 5/1-101, *et seq.*, makes it unlawful for "any employer to refuse to hire, to segregate, to engage in harassment . . . or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination . . . ." 775 ILCS 5/2-102(a). "Unlawful discrimination" includes discrimination based on race. 775 ILCS 5/1-103(Q).

158.  Defendants treated Plaintiffs and Plaintiffs' proposed IHRA Race Class less favorably than other individuals outside of their protected class (Black and/or African American), including by maintaining policies and practices that

created and maintained disparate pay between Defendants' Black and/or African American and non- Black and/or African American employees.

159.   Plaintiffs' race and the race of Plaintiffs' proposed IHRA Race Class was a motivating factor for the disparity in pay they received for performing the same or substantially similar work as non- Black and/or African American employees who received more or higher compensation than Plaintiffs and Plaintiffs' proposed IHRA Race Class.

160.   Defendants' policies and practices including: (1) use of diversity outreach programs like MetPro as well as Residency Programs to recruit talent but pay at depressed rates; (2) hiring and recruiting women and African American employees from Community or Local Suburban papers Newspapers, where Defendants anchor offers to depressed salary rates, while recruiting white and male employees from major papers where Defendants offer competitive market salaries; (3) reliance on salary history; and (4) encouraging and maintaining a culture of pay secrecy, have an unlawful disparate impact on Black/African American employees. Further, when evidence of unlawful pay disparities was brought to management's attention, appropriate, remedial actions such as conducting a pay audit or job leveling analysis were refused. The aforementioned practices constitute evidence of intentional discrimination or, at a minimum, create a disparate impact/disparate effect on women and do so without a legitimate business justification.

161.   Plaintiffs and Plaintiffs' proposed IHRA Race Class were harmed as a result of Defendants' conduct, which was a substantial factor in causing Plaintiffs and Plaintiffs' proposed IHRA Race Class' harm.

162.   Economic damages. As a direct and legal result of Defendants' conduct, Plaintiffs and Plaintiffs' proposed IHRA Race Class have and will suffer damages for lost earnings and unpaid wages in an amount not yet fully known, but in excess of the jurisdictional limits of this Court.

163. Non-Economic damages. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiffs and Plaintiffs' proposed IHRA Race Class have and will suffer emotional distress, humiliation, shame, and embarrassment in an amount to be proven at time of trial.

164. The pay policies and practices that resulted in unequal pay for members of the IHRA Race Class began before the statute of limitations period and continued and caused injury/damages within the statute of limitations period.

165. Defendants' actions constituted a willful violation of the above-mentioned laws. As a direct result, Plaintiffs and Plaintiffs' proposed IHRA Race Class has and will continue to suffer substantial losses related to the loss of wages, and they are entitled to recover costs, expenses, and attorney's fees in seeking to compel Defendants to fully perform their obligation under the law and its respective damage amounts according to proof at time of trial.

166. Defendants committed the acts herein despicably, maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiffs and Plaintiffs' proposed Title VII and IHRA Race Class, from an improper and evil motive amounting to malice, and in conscious disregard of the rights of Plaintiffs and Plaintiffs' proposed Title VII and IHRA Race Class. Plaintiffs and Plaintiffs' proposed Title VII and IHRA Race Class are thus entitled to recover punitive damages from Defendants in an amount according to proof.

///

## SIXTH CAUSE OF ACTION

**RACE-BASED PAY DISPARITY**

**IN VIOLATION OF ILLINOIS EQUAL PAY ACT OF 2003**

**(820 ILCS 112/1, *et. seq*.)**

**(On Behalf of Plaintiffs James, Williams, and Rockett and the Race-Based Reporter, Editor, and Photojournalist Classes Against All Defendants)**

167.    Plaintiffs reallege Paragraphs 1 through 166 and incorporate them by reference as though fully stated herein as part of Plaintiffs' Sixth Cause of Action of this Complaint.

168.    The Illinois Equal Pay Act, 820 ILCS 112/1, *et seq*., further prohibits employers from discriminating "between employees by paying wages to an African American employee at a rate less than the rate at which the employer pays wages to another employee who is not African American for the same or substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibility, and which are performed under similar working conditions." 820 ILCS 112/10(a).

169.    Defendants were "employers" under the Equal Pay Act. 820 ILCS 112/5.

170.    Plaintiffs and Plaintiffs' Proposed Race-Based Equal Pay Act Classes were and/or are Defendants' employees under the Equal Pay Act. 820 ILCS 112/5.

171.    Defendants discriminated against Plaintiffs and Plaintiffs' Proposed Race-Based Equal Pay Act Classes on the basis of sex and/or race by paying Plaintiffs and Plaintiffs' Proposed Race-Based Equal Pay Act Classes less than non-Black/African American employees performing "the same or substantially similar work on jobs the performance of which requires substantially similar skill,

45

effort, and responsibility, and which are performed under similar working conditions." 820 ILCS 112/10(a).

172. The difference in pay is not based on (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a bona fide job-related factor other than race.

173. Defendants also rely on salary history to justify paying their female and non-African American employees less based on the employee's prior salary, thus perpetuating a systemic pay gap. *See* 820 ILCS 112/10(b-5).

174. In addition, Defendants fostered a culture of prohibiting their employees from discussing their salaries or compensation with each other in violation of state law. *See* 820 ILCS 112/10(b).

175. As a direct and proximate result of Defendants' discrimination against them, Plaintiffs and Plaintiffs' Proposed Race-Based Equal Pay Act Classes suffered and continue to suffer damages. Each and every time they receive a paycheck infected by the discriminatory pay discrepancy, Plaintiffs and Plaintiffs' Proposed Race-Based Equal Pay Act Classes experienced and continued to experience harm.

176. The pay policies and practices that resulted in unequal pay for members of the Race-Based Equal Pay Act Classes began before the statute of limitations period and continued and caused injury/damages within the statute of limitations period.

177. As a direct and proximate result of Defendants' conduct, as alleged herein, Plaintiffs have been compelled to retain legal counsel, and are entitled to reasonable attorney's fees and costs of suit.

178. Defendants acted with malice and reckless indifference to Plaintiffs and Plaintiffs' Proposed Race-Based Equal Pay Act Classes rights. Therefore,

punitive damages are appropriate in addition to compensatory damages for economic and non-economic injuries. 820 ILCS 112/30(a).

**SEVENTH CAUSE OF ACTION**

**SEX-BASED PAY DISPARITY**

**IN VIOLATION OF ILLINOIS EQUAL PAY ACT OF 2003**

**(820 ILCS 112/1, *et. seq*.)**

**(On Behalf of Plaintiffs Buckley, Wescott, Kujawa, Williams, Rockett, and Gutowski and the State Sex-Based Reporter, Editor, and Photojournalist Classes Against All Defendants)**

179.   Plaintiffs reallege Paragraphs 1 through 178 and incorporate them by reference as though fully stated herein as part of Plaintiffs' Seventh Cause of Action of this Complaint.

180.   The Illinois Equal Pay Act, 820 ILCS 112/1, *et seq*., prohibits employers from discriminating "between employees on the basis of sex by paying wages to an employee at a rate less than the rate at which the employer pays wages to another employee of the opposite sex for the same or substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibility, and which are performed under similar working conditions." 820 ILCS 112/10(a).

181.   Defendants were "employers" under the Equal Pay Act. 820 ILCS 112/5.

182.   Plaintiffs and Plaintiffs' Proposed State Sex-Based Equal Pay Act Classes were and/or are Defendants' employees under the Equal Pay Act. 820 ILCS 112/5.

183.   Defendants discriminated against Plaintiffs and Plaintiffs' Proposed Sex-Based Equal Pay Act Classes on the basis of sex and/or race by paying Plaintiffs and Plaintiffs' Proposed Sex-Based Equal Pay Act Classes less than male

employees performing "the same or substantially similar work on jobs the performance of which requires substantially similar skill, effort, and responsibility, and which are performed under similar working conditions." 820 ILCS 112/10(a).

184.   The difference in pay is not based on (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a bona fide job-related factor other than race.

185.   Defendants also rely on salary history to justify paying their female employees less based on the employee's prior salary, thus perpetuating a systemic pay gap. *See* 820 ILCS 112/10(b-5).

186.   In addition, Defendants fostered a culture of prohibiting their employees from discussing their salaries or compensation with each other in violation of state law. *See* 820 ILCS 112/10(b).

187.   As a direct and proximate result of Defendants' discrimination against them, Plaintiffs and Plaintiffs' Proposed Sex-Based Equal Pay Act Classes suffered and continue to suffer damages. Each and every time they receive a paycheck infected by the discriminatory pay discrepancy, Plaintiffs and Plaintiffs' Proposed Sex-Based Equal Pay Act Classes experienced and continued to experience harm.

188.   The pay policies and practices that resulted in unequal pay for members of the Sex-Based Equal Pay Act Classes began before the statute of limitations period and continued and caused injury/damages within the statute of limitations period.

189.   As a direct and proximate result of Defendants' conduct, as alleged herein, Plaintiffs have been compelled to retain legal counsel, and are entitled to reasonable attorney's fees and costs of suit.

190.   Defendants acted with malice and reckless indifference to Plaintiffs and Plaintiffs' Proposed Sex-Based Equal Pay Act Classes rights. Therefore,

punitive damages are appropriate in addition to compensatory damages for economic and non-economic injuries. 820 ILCS 112/30(a).

## **PRAYER FOR RELIEF**

**WHEREFORE**, PLAINTIFFS pray for relief as follows:

1.     That the Court determines Causes of Action 2 thru 7 may be maintained as a class action and Cause of Action 1 as a collective action;

2.     Declare that Defendants' compensation policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of the Plaintiffs and members of the Plaintiff Classes;

3.     Issue preliminary and permanent injunction against Defendants and Defendants' officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any conduct violating the rights of the Plaintiffs and members of the Plaintiff Classes, and order such injunctive relief as will prevent Defendants from continuing their discriminatory pay practices and from engaging in any further unlawful sex and race discrimination in pay as set forth herein;

4.     Order Defendants to adjust the wage rates and benefits for the Plaintiffs and members of the Plaintiff Classes to the level that they would be enjoying but for Defendants' discriminatory pay policies, practices, and/or procedures;

5.     Award general, liquidated, compensatory (both economic and non-economic), and punitive damages to Plaintiffs and members of the Plaintiff Classes;

6.     Award penalties available under applicable laws;

7.     Interest on the sum of damages awarded, calculated from the first date of incident to the date of judgment;

8.    Order Defendants to make whole the Plaintiffs and members of the Plaintiff Classes by providing them with any other monetary and affirmative relief;

9.    Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Plaintiffs and members of the Plaintiff Classes;

10.    Award Plaintiffs and members of the Plaintiff Classes, all pre-judgment interest and post-judgment interest available under law;

11.    Award Plaintiffs and members of the Plaintiff Classes any other appropriate equitable relief;

12.    Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that Defendants have remedied the practices complained of herein and are determined to be in full compliance with the law;

13.    That all issues herein be determined by a jury; and

14.    Award additional and further relief as this Court may deem just and proper.

///

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.


DATED:   May 16, 2024          KJC LAW GROUP

_____
                                    Kevin Cole

**KJC LAW GROUP, A.P.C.**
Kevin J. Cole
20 N. Clark Street, Suite 3300
Chicago, Illinois 60602
T: 310 861 7797
E: Kevin@kjclawgroup.com

**ALEXANDER MORRISON + FEHR LLP**
Michael Morrison (SBN 205320) (*pro hac vice*)
Jacqueline Gil (SBN 324482) (*pro hac vice*)
1900 Avenue of the Stars, Suite 900
Los Angeles, California 90067
T: 310 394 0888 | F: 310 394 0811
E: mmorrison@amfllp.com | jgil@amfllp.com

Attorneys for Plaintiffs Buckley, James, Wescott, Kujawa, Williams, Rockett, and Gutowski on behalf of themselves and all others similarly situated